UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - DETROIT

IN RE:

JEFF SILER and                                        Case No. 09-60712-wsd
HELEN SILER,                                          Chapter 13
                                                                            Hon. Walter Shapero
         Debtors.
_____/

JEFF and HELEN SILER,

        Plaintiffs,

v.                                                                          Adv. Pro. No. 09-6926

CITIBANK, N.A.,

        Defendant.
_____/

## OPINION REGARDING VALUE OF REAL PROPERTY

      This matter is before the Court upon Debtors' Complaint to Determine the Extent of the Lien of CitiBank, N.A. ("Citi"). A trial was held, following which the parties submitted post-trial briefs and the matter was taken under advisement.

<u>I.</u>

      Debtors filed their voluntary chapter 13 petition on July 1, 2009. As part of their chapter 13 plan, Debtors proposed to retain their residence located at 21226 Fairfield Dr., Macomb, MI (the "Residence"). The Residence is encumbered by a first mortgage in the amount of $187,054.59 and a second mortgage in the amount of $95,600.68. Debtors contend that the second mortgage (held by Citi) is completely unsecured. Debtors initiated this adversary proceeding seeking to treat the second mortgage as an unsecured debt under the plan, i.e., to "strip it" from the Residence. In order to do so, the value of the property must be found to be no more than the first mortgage balance.

1

At the trial, the Court heard testimony from two experts, to wit: real estate appraisers Gary Edgar ("Edgar") and Frank Fortuna ("Fortuna"), as well as the Debtor/owner. The appraisal reports of Edgar and Fortuna were admitted into evidence. Edgar's report valued the property, as of October 16, 2009, at $180,000. In conducting the appraisal, he personally inspected the property and found it to be in average condition with no deferred maintenance. He used a sales comparison approach to determine value, in which he examined four sales that he deemed to be comparable. He testified that he looked only for "distressed sale" comparables because the subject property is part of bankruptcy proceedings. His appraisal report states that its intended use is to "assist the client in determining the subject homes [sic] fair market value if sold under duress." (Exhibit 1, p. 3). The report, examining 4 distressed sale comparables, concluded that the Residence was worth $180,000 as of October 16, 2009.

Fortuna's Report was prepared for the purposes of this proceeding and concluded that the Residence was worth $220,000 as of July 1, 2009. Like Edgar, Fortuna used a sales comparison approach, however, Fortuna's appraisal differed in that Fortuna sought to determine market value in a non-distressed sale scenario. To achieve this, the comparables utilized by Fortuna were all non-bank owned, non-distressed private sales. Fortuna found the Residence to be in "above average" condition and utilized comparables in similar condition.

The Debtor/owner, testified that he believed the value of the property was less than the first mortgage. He stated that he has personal knowledge of at least one foreclosure in his neighborhood, and that he had read on foreclosure.com that there were more than 600 active foreclosures in his zip code.

### III.

The primary issue to be decided is whether Citi's mortgage is wholly unsecured. If it is wholly unsecured, then it is not subject to the antimodification protection of § 1322(b)(2). To decide this particular issue, the Court does not need to determine the actual value of the Residence; rather, it need only determine whether the value of the Residence, as of July 1, 2009, was greater than $187,054.59, the amount of the first mortgage.

Pursuant to the Supreme Court's decision in *Assocs. Commer. Corp. v. Rash*, the appropriate valuation is the "replacement value," that is, "the cost the debtor would incur to obtain a like asset for the same 'proposed…use.'" 520 U.S. 953, 965 (1997). In this case, that would be a consumer purchasing a home as a personal residence, so "retail" or "fair market value," keeping in mind that *Rash* involved a vehicle, the value of which likely did not vary with its location, unlike real estate. The parties agree that the Debtors bear the burden of proving the value of the Residence is less than the first mortgage and that the appropriate date for the valuation is the chapter 13 petition date, July 1, 2009.

## IV.

A review of the evidence and testimony leads the Court to conclude that Plaintiffs' have not met their burden of proving the Residence was worth less than $187,054.59. The Court found both of the experts to be credible, but did not subscribe to either of their valuations completely for reasons hereinafter set forth.

Edgar's appraisal was directed toward a determination of a "distressed sale" value for the Residence. While its conclusions may have been well founded in light of that focus, a "distressed sale" value is not properly the relevant standard to be used. A distressed sale value, i.e., what the property would be worth in a so-called short sale or as a mortgagee owned foreclosed property being marketed by the mortgagee, is practically indistinguishable from the foreclosure-value standard rejected by the Supreme Court in *Rash*. A home in good condition is itself obviously worth more than one that is not. That said, however, its value, despite its condition, might very well be influenced by the neighborhood in which it is located. If the neighborhood, for instance, contains a material number of vacant and/or foreclosed homes that may be on the market or might soon be put on the market, the value of the home in good condition will be adversely affected simply by reason of its location and those surrounding conditions. When that situations occurs, to what extent such occurs, and how such is quantified are theoretical and practical problems, particularly in the current residential real estate market situation in southeastern Michigan. What this means in terms of what is before the Court in this and similar cases is that an appropriate valuation can neither ignore actual distressed sales, nor exclusively focus on them. And, limiting the parameters of the valuation

analysis to only non-distressed sales (as is true of Fortuna's opinion), is equally inappropriate. In less difficult times, the differences between sales and properties can largely and more objectively be explained and accounted for by differences in size, construction, and the other tangible differences one can see, measure, and evaluate with some certainty. And, as a result, the differences between high and low are much less than what we see in these times where the intangible and more difficult to quantify effect on the entire market place stems in no small measure from the existence of large numbers of vacant and foreclosed properties, and resulting distressed sales wherever one turns. That has a tendency to produce large differences. Like it or not, these are factors that influence value, but do not set value, except possibly in a situation where the home is literally a very small island in a large sea of vacant and/or vandalized properties. The smaller the sea is in relation to the size of the island, the higher the value of the island and vice versa. The appropriate analysis, extending the metaphor, is therefore one that takes into account the size of the island as well as the area of the sea, and of course the other traditional valuation factors, analyses, and comparisons.

      All four of the comparables used in Edgar's Report were distressed sales and also, there was no adjustment to the comparables to take their condition into account. Fortuna testified that he had viewed pictures on the RealComp website of the comparables used in Edgar's Report, and that two of the properties required new paint and carpeting, had been winterized, and were vacant at the time of sale. Fortuna further testified that if he were to use such comparables, he would make an upward adjustment of $25,000 or so to take account of the fact that the Residence is in above average condition and is occupied (a non-occupied house being worth less). Both experts agree that a distressed value is materially less than a non-distressed valuation. Edgar testified that he thinks there may be up to an 18% differential. Fortuna testified that he does not believe it to be as great as Edgar, but that it is significant nonetheless.

      In this Court's view, in this case the exclusive use of the distressed sale comparables understates the value of the property by more than the difference between the balance due on the first mortgage and Edgar's value figure – that difference being a relatively small one. A proper valuation should take into account all of the indicated types of sales (distressed and non-distressed) and other factors, and doing so for purposes

4

of this case would produce a value that exceeds the first mortgage (not likely by very much), but based on the indicated evidence, by a sufficient amount to conclude that the Debtors have not borne their burden of proof on the primary issue. The foregoing said, and while possibly beyond the scope of this proceeding that the Court ascribe a specific value to the subject property, in the interest of providing some direction to the parties in this, a Chapter 13 case in which the value of the property may be relevant to confirmation, it is the Court's view, based on the foregoing discussion, that the value approximates $200,000.

V.

Defendant shall submit an appropriate order.
.

**Signed on November 17, 2010**

              **/s/ Walter Shapero**
            **Walter Shapero**
            **United States Bankruptcy Judge**